UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 15-4261(DSD/LIB)

David Erickson,

        Plaintiff,

v.                                                    **ORDER**

Hutchinson Technology Incorporated,
Richard Penn, Wayne M. Fortun,
Martha Goldberg Aronson,
Russell Huffer, Frank P. Russomanno,
Philip E. Soran, Thomas R. Verhage,

        Defendants.


James w. Anderson, Esq. and Heins Mills & Olson, PLC, 310 Clifton Avenue, Minneapolis, MN 55403 and Juan E. Monteverde, Esq. and Faruqi & Faruqi, LLP, 685 Third Avenue, 26th Floor, New York, NY 10017, counsel for plaintiff.

Justin P. Krypel, Esq., Wendy J. Wildung, Esq. and Faegre Baker Daniels LLP, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402, counsel for defendants.


This matter is before the court upon the motion for a preliminary injunction by plaintiff David Erickson. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court denies the motion.


**BACKGROUND**

This securities dispute arises out of the proposed merger of defendant Hutchinson Technology Incorporated with entities owned by TDK Corporation. Hutchinson is a Minnesota corporation that researches, designs, manufactures, and supplies suspension assemblies for hard disk drives. Compl. ¶¶ 9, 17. Defendant

Richard J. Penn is Hutchinson's president and chief executive officer, and sits on the Board of Directors. Id. ¶ 10. Defendants Wayne M. Fortun, Martha Goldberg Aronson, Russell Huffer, Frank P. Russomanno, Philip E. Soran, and Thomas R. VerHage are independent outside directors. Id. ¶¶ 11-16.

On February 23, 2015, Albert Ong - the president and chief executive officer of Magnecomp Precision Technology (MPT), a subsidiary of TDK - met with Penn and David Radloff, Hutchinson's vice president and chief financial officer. Steiner Aff. Ex. 1 at 34. During that meeting, Ong proposed that MPT acquire Hutchinson's assembly operations for a cash purchase price of $120 to 130 million plus a potential long-term supply arrangement between the two companies. Id. Penn and Radloff took the proposal under consideration. Id. Within several days, Penn advised Ong that Hutchinson had no interest in the proposed transaction. Id.

In March 2015, Ong contacted Penn and inquired whether Hutchinson would consider a proposal for MPT to acquire Hutchinson. Id. Penn responded that Hutchinson was executing its strategic plans and was not for sale. Id. On March 31, 2015, Penn relayed these communications to the Board during its regular meeting. Id.

In April 2015, MPT's financial advisor contacted Penn and advised him that MPT intended to submit a formal offer to acquire Hutchinson. Id. at 35. Penn and Radloff then interviewed representatives of three investment banking firms based on

2

recommendations from the Board, including Bank of America's wealth management division Merrill Lynch, Pierce, Fenner & Smith Incorporated (BofA Merrill Lynch).  Id. at 7, 35.  On April 29, 2015, the Board held a telephonic meeting.  Id. at 35.  Penn and Radloff summarized their communications with MPT and its financial advisor, discussed the interviews with the investment banking firms, and recommended that Hutchinson engage BofA Merrill Lynch as its financial advisor.  Id.  The Board authorized and directed executive management to negotiate and execute an engagement letter with BofA Merrill Lynch.  Id.  On May 12, 2015, Hutchinson entered into an engagement letter with BofA Merrill Lynch, pursuant to which BofA Merrill Lynch agreed to act as Hutchinson's financial advisor in connection with potential strategic transactions including the possible sale of Hutchinson.  Id.

On May 26, 2015, Penn, Radloff, and BofA Merrill Lynch met with Ong and MPT's financial advisors to present information about Hutchinson to MPT.  Id.  On June 12, 2015, MPT proposed to acquire Hutchinson for an enterprise value of $200 million, which equated to an equity value for Hutchinson of approximately $96.9 million or $2.81 per share.  Id.  Hutchinson's closing stock price on that day was $2.03 per share.  Id.

On June 15, 2015, the Board met and discussed MPT's proposal.  Id.  The Board directed executive management and BofA Merrill Lynch to respond that, although the Board was interested in MPT's

3

proposal, the valuation was too low.  Id.  The Board also directed executive management and BofA Merrill Lynch to continue discussions with MPT in an effort to elicit an improved offer.  Id. Hutchinson's closing stock price on that day was $1.98 per share. Id.  On June 16, 2015, BofA Merrill Lynch conveyed the Board's position to MPT and its financial advisor.  Id.

Over the next four months, Hutchinson and MPT, along with both companies' financial advisors, continued to negotiate.  Id. at 35-39.  On September 24, 2015, Penn, Radloff, and representatives of BofA Merrill Lynch negotiated a per-share merger consideration proposal with Ong and MPT's financial advisor.  Id. at 39.  The proposal consisted of a fixed base consideration of $3.62 per share plus additional cash consideration up to a maximum amount of $0.38 per share.  Id.  Hutchinson's closing stock price on that day was $1.42 per share.  Id.

On September 26, 2015, the Board directed executive management to finalize the merger agreement on those material terms.  Id.  On October 29, 2015, MPT completed its due diligence investigation of Hutchinson and both companies' legal counsel finalized the merger agreement.  Id. at 40.  On October 30, 2015, TDK's Board approved the merger agreement.  Id.

BofA Merrill Lynch conducted a financial analysis and provided its opinion of the merger.  Id. at 41.  Ultimately, BofA Merrill Lynch stated that the merger was financially fair to Hutchinson's

4

shareholders.  Id.

On November 1, 2015, the Board met and reviewed the merger agreement and BofA Merrill Lynch's fairness opinion.  Id.  The Board then formed a special committee of disinterested directors[1] to consider and vote on the merger agreement.  Id.  The special committee approved the merger agreement and recommended that the full Board approve the merger agreement.  Id.  The Board then unanimously (i) approved the merger agreement, (ii) declared it to be fair, advisable, and in the best interests of Hutchinson and its shareholders, (iii) directed that the approval of the merger agreement be submitted to a vote at a shareholder's meeting, and (iv) recommended to shareholders that they approve the merger agreement.  Id.  On November 2, 2015, TDK and Hutchinson issued a joint press release announcing the merger agreement.  Id.

On November 23, 2015, Hutchinson filed a nearly 200-page proxy statement with the Securities and Exchange Commission (SEC).  Compl. ¶ 46.  The proxy includes information from BofA Merrill Lynch's financial analysis.  Relevant to Erickson's motion, the proxy provides a summary of BofA Merrill Lynch's Selected Publicly Traded Companies Analysis, Selected Precedent Transactions Analysis, and Selected Precedent Transactions Premiums Analysis.  Id. ¶¶ 47-49; Steiner Aff. Ex. 1 at 47-49.  The proxy advises

---

[1]  The disinterested directors had not been officers or employees of Hutchinson during the prior five years, pursuant to Minn. Stat. § 302A.673, subd. 1.  Steiner Aff. Ex. 1 at 41, A-15.

Hutchinson shareholders of the Board's unanimous recommendation to vote in favor of the merger.  Steiner Aff. Ex. 1 at 7. Shareholders are schedule to vote on the merger on January 28, 2016.  Id. at 2.

On November 30, 2015, Erickson filed a putative class action complaint alleging that the defendants violated §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and Rule 14a-9.  On December 18, 2015, Erickson filed a motion for a preliminary injunction to enjoin the shareholder vote until defendants disclose certain omitted information.  Specifically, Erickson alleges that the proxy's summary of the aforementioned analyses omits material information.

## DISCUSSION

A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  The court considers four factors in determining whether a preliminary injunction should issue:  (1) the likelihood of the movant's ultimate success on the merits, (2) the threat of irreparable harm to the movant in the absence of relief, (3) the balance between the harm alleged and the harm that the relief may cause the non-moving party, and (4) the public interest.  Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  No single

factor is determinative. Id. at 113.  Instead, the court considers the particular circumstances of each case, remembering that the primary question is whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  Id.

## I.   Likelihood of Success on the Merits

The court first considers the "most significant" Dataphase factor: the likelihood that the movant will prevail on the merits. S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).  Erickson alleges that Hutchinson violated § 14(a) and Rule 14a-9 by filing a materially incomplete and misleading proxy asking its shareholders to vote in favor of the proposed merger.

Section 14(a) prohibits the solicitation of any proxy in a manner which violates rules promulgated by the SEC.  15 U.S.C. § 78n(a).  Rule 14a-9 prohibits solicitation of proxies by means of proxy statements which contain false or misleading statements concerning any material fact or omissions of material facts which make any part of the statement misleading.  17 C.F.R. § 240.14a-9. In order to establish a violation of § 14(a) and Rule 14a-9, a plaintiff must prove: (1) the proxy statement contains a material misrepresentation or omission, (2) the defendants were negligent in drafting the statement, and (3) the proxy was an the essential link in completing the transaction in question.  Lone Star Steakhouse & Saloon, Inc. v. Adams, 148 F. Supp. 2d 1141, 1151 (D. Kan. 2001).

7

### A.    Negligence and Essential Link

The first element is the lynchpin to a § 14(a) claim, as the second and third elements typically fall in to place if the first element is established.  "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the ... negligence standard.  Accordingly, a director may be found negligent under Section 14(a) for a failure to notice material omissions upon reading a proxy statement."  Brown v. Brewer, No. CV06-3731-GHK SHX, 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010).  Similarly, it is accepted that the proxy statement forms an essential link in such circumstances.  See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig., 757 F. Supp. 2d 260, 292 (S.D.N.Y. 2010) ("The merger ... could have been consummated only with ... shareholder approval of the transaction.  Thus, the Joint Proxy was an essential link in the transaction because the acquisition could not have occurred without the shareholder vote.").  This case comports with the above-cited propositions.  Accordingly, the critical question when evaluating the likelihood of success on the merits is the materiality of the omitted information.

### B.   Materiality

Erickson seeks two types of information: (1) the key metrics summarizing the multiples observed in BofA Merrill Lynch's Selected

Publicly Traded Companies Analysis and Selected Precedent Transactions Analysis; and (2) the key metrics or the specific transactions BofA Merrill Lynch used in its Selected Precedent Transactions Premiums Analysis. Erickson alleges that this omitted information is material and that, without it, Hutchinson's proxy statement is misleading. He further alleges that Hutchinson shareholders need this omitted information to determine whether the implied per share equity reference ranges accurately reflect the value of the shares and whether the selected comparative transactions were appropriate.

### 1.    Information Provided in the Proxy Statement

The proxy already provides a significant amount of detail about these financial analyses. As to the Selected Publicly Traded Companies Analysis, Erickson alleges that Hutchinson is required to disclose the range, mean, and median multiples regarding revenue and earnings before interest, taxes, depreciation, and amortization (EBITDA) for the selected companies. The proxy names eight publicly traded companies in the hard disk drive and high-precision components and manufacturing industries. Steiner Aff. Ex. 1 at 47.

Regarding the revenue multiples, the proxy states that BofA Merrill Lynch reviewed the companies' enterprise values (EV) as a multiple of calendar year 2016 estimated revenue. Id. It then states that BofA Merrill Lynch applied revenue multiples of 0.50x to 0.75x - derived from the selected companies - to Hutchinson's

calendar year 2016 estimated revenue.  Id.  Finally, it states that this analysis indicated an approximate implied per share equity reference range of $1.10 to $3.05, as compared to the merger consideration of $3.62 per share with the possibility of an additional $0.38 per share.  Id.

Regarding the EBITDA multiples, BofA Merrill Lynch reviewed the companies' EV as a multiple of calendar year 2016 EBITDA.  Id. The proxy states that BofA Merrill Lynch then applied EBITDA multiples of 4.5x to 6.5x - derived from the selected companies - to Hutchinson's calendar year 2016 estimated EBITDA.  Id.  Based on this analysis, BofA Merrill Lynch calculated an approximate implied per share equity reference range of $0.00 to $1.15.  Id.

Similarly, for the Selected Precedent Transactions Analysis, Erickson alleges that Hutchinson is required to disclose the range, mean, and median revenue multiples for the selected transactions. The proxy cites eleven transactions involving companies in the hard disk drive industry that BofA Merrill Lynch reviewed.  Id. at 48. The proxy identifies these transactions by the acquiror, the target company, and the announcement date.  Id.  It then states that BofA Merrill Lynch applied last-twelve-month revenue multiples of 0.40x to 0.85x - derived from the selected transactions - to Hutchinson's estimated revenue for the twelve months ending September 27, 2015. Id.  The proxy states that this analysis indicated an approximate implied per share equity reference range of $0.20 to $3.55.  Id.

10

For the Selected Precedent Technology Transactions Premiums Analysis, Erickson alleges that Hutchinson is required to disclose which transactions were used in the analysis, or provide the key metrics (i.e., number of transactions, industry, and EV) for those transactions. The proxy states that BofA Merrill Lynch identified transactions for publicly traded companies in the technology industry that were announced between 2010 and November 1, 2015. Id. at 49. The proxy then provides the calculated premium over the target company's unaffected stock price one day, one month, and three months before the announcement of each transaction. Id. For all of these calculations, the proxy provides the mean and median premiums. Id. The proxy goes on to state that BofA Merrill Lynch applied a range of calculated premiums from 21.0% to 50.6% to the price per share of $1.81 for Hutchinson's common stock as of the close of trading on October 29, 2015. Id. The proxy states that this analysis indicated an approximate implied per share equity reference range of $2.20 to $2.75. Id.

## 2. Entitlement to Additional Disclosures

An omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384 (1970). Put another way, an omission is material if disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix"

11

of information made available.  TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976).

However, "a shareholder is not entitled to disclosures sufficient to make his own independent assessment of a stock's value.  Nor is he entitled to information merely because he believes it would be useful.  Rather, he is entitled only to a fair summary of a financial advisor's work."  Calleros v. FSI Int'l, Inc., 892 F. Supp. 2d 1163, 1175 (D. Minn. 2012) (citation and internal quotation marks omitted); see also Gottlieb v. Willis, No. 12-CV-2637, 2012 WL 5439274, at *4 (D. Minn. Nov. 7, 2012) (stating that "[o]mitted facts are not material simply because they might be helpful," and shareholders are not entitled to demand "all the financial data they would need if they were making an independent determination of fair value").  "Notably, the fact that the financial advisors may have considered certain nondisclosed information does not alter this analysis."  Calleros, 892 F. Supp. 2d at 1175 (quoting La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc., 886 F. Supp. 2d 1255, 1264 (W.D. Okla. 2012)).  "So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment."  Gottlieb, 2012 WL 5439274, at *4 (quoting In re 3Com S'holders Litig., No. 5067-CC, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009)).

Essentially, Erickson argues that he needs the omitted information to determine whether he should give any credit to BofA Merrill Lynch's financial analysis.  While Erickson identifies proxies for other companies' proposed mergers which disclose the information omitted here, he fails to identify a single case where a court granted a preliminary injunction because the company's proxy omitted such information.  In fact, this court has denied a preliminary injunction under nearly identical circumstances.  See Calleros, 892 F. Supp. 2d 1163 (denying preliminary injunction seeking financial multiples observed for each of the publicly traded companies listed in the financial advisor's Comparable Company Analysis, Precedent Transactions Analysis, and Premiums Paid Analysis).

Moreover, courts have critiqued shareholders who seek "information [which] may have provided some insight into the fairness calculus used by the financial advisor" but "falls far short of necessary to enable the stockholders to make an informed decision." Malon v. Franklin Fin. Corp., No. 3:14CV671-HEH, 2014 WL 6791611, at *7, *10 (E.D. Va. Dec. 2, 2014).  That is because those shareholders "elevate[] useful information to the stature of essential to an informed decision." Id. at *10; see also Dent v. Ramtron Int'l Corp., No. CIV.A. 7950-VCP, 2014 WL 2931180, at *10 (Del. Ch. June 30, 2014) (quoting Zirn v. VLI Corp., No. CIV. A.9488, 1995 WL 362616, at *4 (Del. Ch. June 12, 1995), aff'd, 681

13

A.2d 1050 (Del. 1996)) ("[C]ourts must 'guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure.'"). As the <u>Malon</u> court stated, "This is not the sort of situation where stockholders have only a banker's unadorned opinion of the deal and the market price of the stock to judge the adequacy of the proposed merger.... The minutia Plaintiff contends should have been disclosed in the Proxy seems too abstract to enlighten the typical stockholder." <u>Id.</u>

Indeed, when shareholders seek such detail, courts have questioned their motives and stated that shareholders are "not entitled to the extensive financial data necessary to recreate the financial advisor's determination of fair value." <u>Id.</u>; <u>see also</u> <u>Himmel v. Bucyrus Int'l, Inc.</u>, No. 10-C-1104, 2014 WL 1406279, at *19 (E.D. Wis. Apr. 11, 2014) ("Directors need not provide financial information that is merely helpful.... Nor must they disclose all data underlying a fairness opinion such that a shareholder can make an independent determination of value.") (citations omitted); <u>Calleros</u>, 892 F. Supp. 2d at 1175; <u>Gottlieb</u>, 2012 WL 5439274, at *4; <u>La. Mun. Police Emps.' Ret. Sys.</u>, 886 F. Supp. 2d at 1264; <u>Dent v. Ramtron Int'l Corp.</u>, No. CIV.A. 7950-VCP, 2014 WL 2931180, at *13-14 (Del. Ch. June 30, 2014). For example, in <u>Dent</u>, the plaintiff asserted that shareholders were "unable to determine whether the [financial analysis] is reliable" as to the "Selected Company Analysis," "Selected Transaction Analysis," and

"Stock Price Premium Analysis." <u>Dent</u>, 2014 WL 2931180, at *13-14.
The court, however, characterized plaintiff's claim as "a
transparent attempt to repackage the argument that disclosures must
contain enough information to enable a stockholder to make an
independent determination of fair value." <u>Id.</u> at *14.  The court
also stated that the plaintiff was seeking "additional disclosures
that would support his belief that [the financial advisor] erred in
conducting its ... analysis" but that the "issue of whether [the
financial advisor] used the correct rates and multiples ... is an
entirely distinct issue from whether the Proxy contains a fair
summary of the analysis that [the financial advisor] actually
conducted." <u>Id.</u>  The court ultimately found that the company's
shareholders had already been "given sufficient information." <u>Id.</u>
Erickson's allegations bear striking resemblance to the requests
made in <u>Dent</u> and the other above-cited cases.

Moreover, Erickson's allegation that the omitted information
renders the proxy misleading falls short.  Specifically, he "relies
on various <u>truthful</u> statements made in the proxy statement and
argues that defendants must tell him more about the subject of
those statements.  However, ... the element of false or misleading
statement is distinct from the element of materiality." <u>Orlando v.
CFS Bancorp, Inc.</u>, No. 2:13-CV-261 JD, 2013 WL 5797624, at *4 (N.D.
Ind. Oct. 28, 2013) (emphasis in original) (citing <u>Gottlieb</u>, 2012
WL 5439274).  Much like in <u>Orlando</u>, Erickson "does not allege that

15

any information omitted from the proxy statement was required to be disclosed by a particular SEC regulation, nor has [he] identified any specific statements in the proxy rendered misleading by said omissions.  The absence of this information greatly diminishes the likelihood of success." Id. at *5 (citation omitted).

Overall, the court finds that the omitted information is not material because its disclosure would not significantly alter the total mix of information available to Hutchinson's shareholders. Hutchinson's proxy approaches 200 pages in length and gives shareholders a more than sufficient summary of BofA Merrill Lynch's financial analysis.  Erickson simply seeks additional information to determine whether he should give any credit to BofA Merrill Lynch's financial analysis.  But that request does not demonstrate how the proxy is misleading.  Moreover, his request resembles that of a shareholder looking to perform his own financial analysis. Hutchinson is not obligated to make additional disclosures for that purpose.  Accordingly, the first factor weighs against granting a preliminary injunction.

## II.  Irreparable Harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (per curiam) (quoting Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)).  "Irreparable harm occurs when a

16

party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). Courts should "consider 'traditional equitable principles' when deciding whether to grant injunctive relief, including whether the plaintiff has shown that 'remedies available at law, such as monetary damages, are inadequate to compensate' him." Calleros, 892 F. Supp. 2d at 1172 (quoting eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391-94 (2006)). Failure to show irreparable harm is "an independently sufficient ground upon which to deny" an injunction. Watkins, 346 F.3d at 844.

Erickson argues that Hutchinson shareholders will suffer irreparable harm because they will be denied the ability to cast informed votes. That alone, however, is insufficient, as an adequate remedy at law remains in the form of money damages and the State of Minnesota's appraisal procedure.

### A.   Availability of Damages

Courts have rejected the notion that the "threat of an uninformed stockholder vote constitutes irreparable harm per se." Calleros, 892 F. Supp. 2d at 1172 (emphasis in original) (citation and internal quotation marks omitted). The Calleros court identified four possible scenarios which could result from an uninformed stockholder vote: (1) the shareholder "wrongly" opts to tender when, based on the undisclosed information, he would not

have done so, (2) the shareholder "wrongly" opts not to tender when he should have done so, (3) the shareholder "correctly" opts to tender, or (4) the shareholder "correctly" opts not to tender. <u>Id.</u> The court found that none of the four possibilities results in irreparable harm. <u>Id.</u> at 1173. Under options (3) and (4), a shareholder suffers no harm because "he chose a course of conduct consistent with the information he sought. In other words, the 'correct' information would not have altered the shareholder's decision to tender (or to not tender) his shares." <u>Id.</u> Under options (1) and (2), there is "no reason why any harm to the shareholder could not be remedied with damages." <u>Id.</u> The court summarized the remedy for those options as follows:

> Consider, for example, the stockholder who declines to tender his shares in response to a tender offer due to misinformation from company insiders when, if he had received accurate information, he would have opted to do so. The shareholder's harm in that situation is nothing more than the missed opportunity to sell his shares at the tender-offer price. It seems fairly obvious that such an individual could be made whole through damages equal to the tender-offer price per share. Similarly, there is no apparent reason why a stockholder who tenders his shares when he should not have - that is, someone who wrongly sells his shares for too little, due to misinformation from the company's officers or directors - could not have that "error" compensated with money damages.

<u>Id.</u> (citing <u>Gold Fields Ltd. v. Harmony Gold Mining Co.</u>, No. 04-CV-8767, 2004 WL 2710030, at *1 (S.D.N.Y. Nov. 23, 2004)); <u>see also</u> <u>Rondeau v. Mosinee Paper Corp.</u>, 422 U.S. 49, 60 (1975)("[T]hose

persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages."). The Calleros court noted that "courts routinely deny injunctive relief on claims like those pressed by [plaintiff] due to the lack of irreparable harm," and held that plaintiff's "failure to show irreparable harm is a sufficient reason to deny his Motion." Calleros, 892 F. Supp. 2d at 1173-74; see also Orlando, 2013 WL 5797624, at *5-6 ("[B]ecause the court could later undo the damage caused by any alleged ... illegal proxy statement by providing monetary damages - which typically constitutes an adequate remedy at law - an adequate alternative exists.... The potential loss by shareholders should not be difficult to quantify as a basis for legal relief, and can be remedied after the merger.").

**B.   State Appraisal Procedure**

Moreover, the State of Minnesota's appraisal procedure provides Erickson with another adequate remedy at law.[2] See Minn. Stat. §§ 302A.471, 302A.473. Specifically, the procedure provides an adequate remedy at law for shareholders who are concerned about uninformed votes and whether "the share price offered in a proposed transaction is unfair." Lusk v. Life Time Fitness, Inc., 15-CV-1911, 2015 WL 2374205, at *2 (D. Minn. May 18, 2015). Under the appraisal procedure, Erickson may file a notice of his intent to

---

[2] Hutchinson informed shareholders of the process in the proxy statement.  Steiner Aff. Ex. 1 at 9, 24, 57-59.

demand payment of the fair value of his shares before the vote, and vote against the proposed merger.  Id. § 302A.473, subds. 3, 4(b). Hutchinson would then pay Erickson what it believes to be the fair value of his shares plus interest.  Id., subd. 5.  If Erickson believes that Hutchinson has undervalued his shares, he may provide it with his estimate of the fair value plus interest and demand payment of the difference.  Id., subd. 6.  Hutchinson then would pay Erickson the difference or initiate an appraisal proceeding for a state court to determine the fair value plus interest.  Id., subd. 7.  If the court determines that the value is more than what Hutchinson has paid, Erickson would receive the difference plus interest.  Id.  In fact, Minnesota's appraisal procedure protects dissenting shareholders like Erickson even if they were wrong to initiate the appraisal process because, if the state court were to determine that the value is less than the amount paid by Hutchinson, Erickson would not be liable for the difference.  Id. Thus, under this process, Erickson can only receive more per share.

Erickson's allegations fall short of establishing irreparable harm.  Erickson must "show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  Iowa Utils. Bd. v. F.C.C., 109 F.3d 418, 425 (8th Cir. 1996).  "A mere possibility of irreparable harm is not enough" to issue an injunction.  Superior Edge, Inc. v. Monsanto Co., 964 F. Supp. 2d 1017, 1046 (D. Minn. 2013).  Here, two of the

20

four possible scenarios involve shareholders suffering no damages. In the other two scenarios, there are adequate remedies at law in the form of money damages and the state's appraisal procedure. As a result, Erickson's allegations do not establish irreparable harm, and denial of his motion for a preliminary injunction is warranted on that basis.

## III. Balance of Harms

Erickson argues that the balance of harms weighs in his favor. Specifically, he argues that Hutchinson's shareholders will be harmed by casting uninformed votes, while defendants will face minimal harm if there is a delay in voting. Defendants respond that a delay could have a material adverse effect and derail the merger. Defendants further argue that Hutchinson's shareholders would be harmed if they are prevented from realizing a premium on their shares.

The court agrees that potentially delaying or derailing a merger creates a weighty hardship that is difficult to overcome. See Malon, 2014 WL 6791611, at *3 ("[P]ostponing the shareholder vote would entail significant hardship.... If [defendant] is required to file and distribute a supplemental proxy, it will incur additional expenses and attorney's fees.... [The proposed merger] is the only viable pending offer on the table. There is no assurance in a fluctuating market that the opportunity will remain available on the terms negotiated."); Gottlieb, 2012 WL 5439274, at

*7 (noting that the "[c]ourt might inflict irreparable harm by enjoining the merger" and that "enjoining a large and complex transaction such as this will at a minimum create uncertainty and delay. Such a delay could also impose costs on the participants in the form of the lost time value of money, and ultimately could even jeopardize the transaction"); Minzer, 1997 WL 34842191, at *13 (acknowledging that there would be "concrete hardships should an injunction be issued, including costs expended thus far in preparing the merger ... diminution of the value of the merger ... [and] the associated increased accounting costs that would ensue were another date to be chosen").

Further, keeping shareholders from realizing a premium on their shares outweighs allegations of harm from uninformed votes. See Orlando, 2013 WL 5797624, at *2, *6 (denying preliminary injunction for an "informed vote" and noting that "enjoining a complex and time sensitive transaction such as this will at a minimum create uncertainty and delay. Such a delay could jeopardize the transaction itself, at the risk of an agreement expected to garner shareholders a premium over [defendant's] current stock price. Under these circumstances, the balance of the harms and public interest dictate that plaintiff's motion be denied"); Calleros, 892 F. Supp. 2d at 1172, 1174 (denying preliminary injunction for the "threat of an uninformed stockholder vote" because of "the risk that security holders will lose the

22

opportunity to cash in their investment at a substantial premium" and "realizing a substantial gain on their shares"); Dixon v. Cost Plus, No. 12-CV-02721-LHK, 2012 WL 2499931, at *3, *12 (N.D. Cal. June 27, 2012) (denying preliminary injunction for an "informed vote" and noting, "Courts are reluctant to enjoin premium generating transactions").

As noted, even if Erickson is harmed, he has avenues to remedy that harm.   That is not the case for Hutchinson and its shareholders if the merger is put at risk through delay. Hutchinson's shareholders have the present opportunity to cash out their shares for $3.62 to $4.00 per share, a significant premium given recent share prices.  Delay will jeopardize that opportunity. As a result, the balance of hardships weigh against granting a preliminary injunction.

## IV.  Public Interest

The final Dataphase factor requires the court to consider the public interest.  Dataphase, 640 F.2d at 114.  The public interest supports informed voting.  Lone Star Steakhouse & Saloon, 148 F. Supp. 2d at 1150.  However, Minnesota law puts the boards of directors, not courts or shareholders, in charge of governing corporate affairs.  See Minn. Stat. § 302A.201, subd. 1 ("Board to manage. The business and affairs of a corporation shall be managed by or under the direction of a board...."); see also Haley v. Forcelle, 669 N.W.2d 48, 58 (Minn. App. 2003) ("Minnesota courts

are generally reluctant to interfere with corporate
decision-making."). Shareholders have other ways to exercise their
rights:

> Plaintiff can vote against the proposed
> incentive plan. He can seek to persuade other
> shareholders to vote against the plan. He can
> even sell his shares. All of these actions
> are consistent with the public interest in
> allowing the efficient internal affairs of the
> corporation to maximize shareholder wealth.
> But seeking to enjoin the vote altogether, in
> the hopes of obtaining disclosure of
> information that is incorrect, immaterial, or
> already disclosed, is definitely not in the
> public interest.

Masters v. Avanir Pharm., Inc., 996 F. Supp. 2d 872, 887 (C.D. Cal.
2014).

Moreover, and similar to analysis of the balance of harms, the
public interest is not served by enjoining a premium generating
transaction. See Calleros, 892 F. Supp. 2d at 1174 (quoting In re
CheckFree Corp. Shareholders Litig., Civ. A. No. 3193-CC, 2007 WL
3262188, at *4 (Del. Ch. Nov. 1, 2007)) ("[T]he public interest
requires an especially strong showing where a plaintiff seeks to
enjoin a premium transaction...."); see also Orlando, 2013 WL
5797624, at *6; Gottlieb, 2012 WL 5439274, at *7.

Here, the public interest would not be furthered by requiring
disclosure of the non-material omitted information. Rather,
enjoining the shareholder vote upsets the corporate governance
model and threatens to harm shareholders who stand to realize a
substantial premium on their shares. The public interest would not

24

be furthered by granting a preliminary injunction under these circumstances.  Considered together, all four <u>Dataphase</u> factors weigh against a preliminary injunction.

### CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that Erickson's motion for a preliminary injunction [ECF No. 11] is denied.


Dated:  January 26, 2016.


                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court